No. 2015-1838

# United States Court of Appeals for the Federal Circuit

NUVASIVE, INC.,

*Appellant,*

v.

MEDTRONIC, INC.,

*Appellee.*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board, No. IPR2014-00034

## APPELLEE'S RESPONSE BRIEF

Justin J. Oliver
FITZPATRICK, CELLA,
  HARPER & SCINTO
975 F Street, N.W.
Washington, D.C. 20004
(202) 721-5423

Jeff E. Schwartz
FOX ROTHSCHILD, LLP
1030 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 696-1470

John C. O'Quinn
William H. Burgess
Dennis J. Abdelnour
Brian H. Gold*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

Sharre Lotfollahi
Kevin Bendix
KIRKLAND & ELLIS LLP
333 South Hope St.
Los Angeles, CA 90071
(213) 680-8400

*Counsel for Medtronic, Inc.*

April 27, 2016

**U.S. Patent No. 8,000,782, Claim 1 (A98):**

1. A surgical system for neural monitoring while forming an operative corridor in a trans-psoas approach to a spine, comprising:

a sequential dilation access system comprising a plurality of dilating cannulas to form a trans-psoas corridor between a skin surface and a targeted spine site, the plurality of dilating cannulas comprising an outer dilating cannula fitting over another of the dilating cannulas when advanced in a trans-psoas path toward the targeted spine site,

wherein a stimulation electrode is positioned on at least one of the dilating cannulas to deliver a stimulation signal for nerve monitoring proximate to a distal end of the dilating cannula when advanced in the trans-psoas path, the stimulation electrode being arranged in a fixed position relative to a longitudinal axis of the at least one dilating cannula such that the stimulation electrode rotates with the at least one dilating cannula when the at least one dilating cannula is rotated about the longitudinal axis;

a working corridor instrument that is slidable over the outer dilating cannula to form a trans-psoas operative corridor to the targeted spine site.

# CERTIFICATE OF INTEREST

Counsel for Appellee Medtronic, Inc., certifies the following:

**1.      The full name of every party represented by us is**:  Medtronic, Inc.

**2.      The name of the real party in interest is:**  Medtronic, Inc. and Medtronic plc.

**3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:**  Medtronic plc wholly owns and is the ultimate parent of Medtronic, Inc.  Medtronic plc is a publicly traded corporation.  No other publicly traded corporation owns 10% or more of the stock of Medtronic plc.

**4.      The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this Court are:**

Kirkland & Ellis LLP:  John C. O'Quinn, William H. Burgess, Dennis Abdelnour, Sharre S. Lotfollahi, Kevin Bendix, and Brian H. Gold

Fitzpatrick, Cella, Harper & Scinto:  Justin J. Oliver and Brian L. Klock

Fox Rothschild LLP:  Jeff E. Schwartz

# **TABLE OF CONTENTS**

STATEMENT OF RELATED CASES ..................................................... v

PRELIMINARY STATEMENT ............................................................ 1

STATEMENT OF THE ISSUE ............................................................. 2

STATEMENT OF THE CASE ............................................................. 3

I.    Background ............................................................................. 3

    A.    Spinal Surgery and Prior Art ........................................... 3

        1.    Minimally-Invasive Spinal Surgery ........................... 3

        2.    Methods and Instruments For Minimally-Invasive Spinal Procedures ......................................................... 5

        3.    Nerve Monitoring Technology ................................... 8

        4.    Directions of Approach for Spinal Surgery ............... 12

    B.    The '782 Patent .............................................................. 16

        1.    Written Description ................................................. 16

        2.    Claims .................................................................... 19

II.    *Inter Partes* Review Proceedings ......................................... 20

    A.    The Board's Institution Decision .................................... 20

    B.    The Board's Final Written Decision ............................... 22

        1.    Construction of the "Trans-Psoas" Claim Terms ...... 22

        2.    Obviousness Analysis .............................................. 22

STANDARD OF REVIEW ................................................................ 27

SUMMARY OF THE ARGUMENT ................................................... 28

ARGUMENT ................................................................................. 30

i

I.      Substantial Evidence Supports The Board's Finding That One Of Skill In The Art Would Have Been Motivated To Combine Standard, Known Nerve-Monitoring Technology With Standard, Known Surgical Tools .................................................................................31

        A.      The Board Properly Considered the "Trans-Psoas" Claim Terms ...............................................................................34

        B.      Regardless of the Import of the Trans-Psoas Terms, Substantial Evidence Supports The Board's Finding Of A Motivation To Combine ..................................................................36

                1.      Marino And Kelleher Disclose The Motivation To Combine ...............................................................38

                2.      Obenchain Broadly Discloses Any Path Through The Psoas Muscle, Further Bolstering The Obviousness Determination..............................................................42

II.     Substantial Evidence Supports The Board's Finding That NuVasive's Evidence Of Secondary Considerations Did Not Warrant A Finding Of Non-Obviousness ...........................................................................43

        A.      Substantial Evidence Supports The Board's Finding That There Was An Inadequate Link Between The Alleged Success And Praise Of XLIF And The Claimed Invention .....................................44

                1.      "XLIF" Comprises Various Systems Of Surgical Tools, As Well As A Surgical Technique, None Of Which Is Commensurate With The '782 Claims .....................................47

                2.      The Features Of XLIF That NuVasive Contends Are Responsible For The Alleged Praise And Success Are Not Recited In The Claims .......................................................51

        B.      Substantial Evidence Supports The Board's Weighing of NuVasive's Secondary Considerations Evidence ...............................54

        C.      NuVasive's Inconsistent Positions Below Further Undermined its Secondary Considerations Evidence .............................................60

CONCLUSION ......................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350 (Fed. Cir. 2015)...................37

*Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310 (Fed. Cir. 2008)........................46

*Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064 (Fed. Cir. 2015) ........................ 41, 43

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)........................................ 28, 30

*Dickinson v. Zurko*, 527 U.S. 150 (1999) ...............................................................28

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) ............................................... 27, 45

*In re Caveney*, 386 F.2d 917 (C.C.P.A. 1967)......................................................45

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063 (Fed. Cir. 2012)................................................... 31, 54

*In re GPAC Inc.*, 57 F.3d 1573 (Fed. Cir. 1995) ....................................................45

*In re Huai-Hung Kao*, 639 F.3d 1057 (Fed. Cir. 2011).............................. 46, 47, 53

*In re Mouttet*, 686 F.3d 1322 (Fed. Cir. 2012) ................................................ 42, 43

*In re Sullivan*, 498 F.3d 1345 (Fed. Cir. 2007)......................................................35

*In re Thompson*, 545 F.2d 1290 (C.C.P.A. 1976).......................................... 34, 45, 46

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) .................. 2, 29, 31, 32, 37, 45

*Merck & CIE v. Gnosis S.P.A.*, 808 F.3d 829 (Fed. Cir. 2015)........................ 27, 42

*On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080 (Fed. Cir. 2000)..........28

*Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299 (Fed. Cir. 2006)............ 46, 49, 53

*S. Ala. Med. Sci. Found. v. Gnosis S.P.A.*, 808 F.3d 823 (Fed. Cir. 2015) .............45

*Smith & Nephew, Inc. v. Rea*, 721 F.3d 1371 (Fed. Cir. 2013) ...............................34

*Solder Removal Co. v. U.S. Int'l Trade Comm'n*, 582 F.2d 628 (C.C.P.A. 1978)................................................................. 45, 46

*Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530 (Fed. Cir. 1983)........................45

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ........................................28

*Wyers v. Master Lock Co.*, 616 F.3d 1231 (Fed. Cir. 2010)....................... 45, 46, 59

**Statute**

35 U.S.C. § 103 (2006) ............................................................................31

**Regulation**

37 C.F.R. § 42.6(a)(3) .............................................................................50

**NOTE**: All emphasis in quoted material has been added unless otherwise indicated.

## STATEMENT OF RELATED CASES

No appeal has previously been taken from the proceeding below.

This is one of four related appeals that this Court designated as companion appeals, to be heard by the same merits panel: **(1)** No. 15-1838, **(2)** No. 15-1839 (consolidated with 15-1840); **(3)** 15-1841, and **(4)** 15-1842 (consolidated with 15-1843).

Together, the appeals arise out of six *inter partes* review proceedings concerning four related NuVasive patents.

| Appeal | PTAB Docket | Patent |
|--------|-------------|--------|
| 15-1838 | IPR2014-00034 | 8,000,782 |
| 15-1839 | IPR2014-00073 | 8,192,356 |
| 15-1840 | IPR2014-00074 | 8,192,356 |
| 15-1841 | IPR2014-00075 | 8,016,767 |
| 15-1842 | IPR2014-00081 | 8,005,535 |
| 15-1843 | IPR2014-00087 | 8,005,535 |

The six *inter partes* reviews were briefed separately, argued together at a common hearing on December 4, 2014, and resolved in separate final written decisions by the same three-member panel of the Patent Trial and Appeal Board.

As shown below, the companion proceedings involve overlapping sets of prior art references.

| Patent | '782 | '356 | | '767 | '535 | |
|---|---|---|---|---|---|---|
| IPR No. 2014-___ | 00034 | 00073 | 00074 | 00075 | 00081 | 00087 |
| Appeal No. 15- | -1838 | -1839 | -1840 | -1841 | -1842 | -1843 |
| Blewett (WO 03/005887 A2) | | * | | * | | |
| Branch (US 6,945,933 B2) | | * | | * | | |
| Cistac (DE 100 48 790 A1) | | * | * | | | |
| Foley (US 5,782,044) | * | | * | | | |
| Foley (US 5,902,231) | | | | | * | * |
| Jones (US 4,595,013) | | * | * | | | |
| Kelleher (WO 01/37728 A1) | * | * | * | | * | |
| Koros (US 6,139,493) | | * | * | * | | |
| Marino (WO 00/38574 A1) | * | | | | * | * |
| Mathews (US 5,171,279) | | * | * | | | |
| Michelson (US 5,772,661) | | * | * | | | |
| Obenchain (US 5,313,962) | | * | * | * | | |
| Obenchain (US 5,195,541) | * | | | | * | * |
| Onimus (WO 00/27291 A1) | | * | * | | | |
| Prass (US 6,292,701 B1) | * | | | | | |
| Simonson (US 6,159,179) | * | | | | | |
| Smith (US 6,679,833 B2) | * | | | | | |
| Isley | * | | | | * | |
| Moed | | | | | * | * |
| NIM Guide (Medtronic) | | * | * | | * | |
| INS-1 (NuVasive 510k) | | | * | | | |
| Epoch 2000 (Axon 510k) | * | | | | | * |

NuVasive is currently asserting U.S. Patent No. 8,000,782 (at issue in this appeal), as well as U.S. Patent Nos. 8,192,356, 8,016,767, and 8,005,535 (at issue in the related appeals) against Medtronic in *Warsaw Orthopedic Inc. v. NuVasive Inc.*, Case No. 3:12-cv-02738-CAB-MDD (S.D. Cal.).

## PRELIMINARY STATEMENT

The Board's obviousness analysis applies basic legal principles to the parties' arguments and record in a straightforward manner that is fully consistent with this Court's precedents. NuVasive strains to conjure "legal" arguments on appeal, but at bottom NuVasive's dispute is a simple disagreement with the Board's weighing of the evidence. The Board's factual findings are supported by substantial evidence, and its decision should be affirmed.

First, substantial evidence supports the Board's finding that a person of skill in the art would have been motivated to combine the teachings of the prior art to arrive at the claims in this case. The prior art was all in the same narrow field. It is undisputed that cannulated (tubular) instruments were known to provide a minimally-invasive alternative to open surgery, and nerve monitoring technology was known in the art to help surgeons detect and avoid nerves during surgery, especially minimally-invasive surgery where nerves are less visible. Moreover, the prior art contained explicit teachings that cannulated instruments and nerve monitoring were useful together for spinal surgery. NuVasive's claims combine those two known elements to perform their established functions in spinal surgeries. The Board's obviousness finding is a straightforward application of the principle that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results," and is supported by substantial evidence. *KSR Int'l*

1

*Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).

Second, the Board's consideration of the evidence of secondary considerations faithfully applies the longstanding principle that a nexus must be shown between secondary considerations evidence and the merits of *novel* features of the specific patent *claims*. Rather than heeding that principle, NuVasive argued among other things that its *entire company*'s revenue was "commercial success," that the existence of direct competition was "copying," and that those and other pieces of evidence about its commercial system in general were "overwhelming" evidence of the nonobviousness of the twelve patent claims at issue in this case. The Board thoroughly considered all of NuVasive's secondary considerations evidence in detail, and concluded that the evidence was entitled to little weight. The Board's consideration of that evidence was fully consistent with binding precedent, and its factual findings are supported by substantial evidence. The Board's final written decision should be affirmed.

## STATEMENT OF THE ISSUE

Whether substantial evidence supports the Board's determination that claims 1, 5, 7-9, 13-18, and 20 of U.S. Patent No. 8,000,782 ("the '782 patent") are unpatentable as obvious over the prior art.

## STATEMENT OF THE CASE

In its final written decision, the Board concluded that claims 1, 5, 7-9, 13-18, and 20 of the '782 patent were obvious. A1-48. Each claim, the Board determined, was obvious in light of two combinations of prior art: (a) one combination based primarily on the Smith reference, A47, and (b) another combination based primarily on the Foley reference. *Id.* NuVasive now appeals and principally challenges the Board's weighing of the evidence with respect to secondary considerations and motivation to combine prior art teachings.

## I. Background

### A. Spinal Surgery and Prior Art

#### 1. Minimally-Invasive Spinal Surgery

The '782 patent claims systems of instruments used in minimally-invasive spinal surgery. A98. The human spine has twenty-four vertebrae and twenty-three discs between the vertebrae. A4621; A5511-14. Discs are made of spongy material, and they absorb shocks, maintain spacing between vertebrae, and allow the spine to move. *Id.*

Surgical procedures are often necessary to address problems caused by trauma or degeneration of parts of the spine. A3300(1:27-37). One common type of spinal surgery is "spinal fusion," where two adjacent vertebrae are bridged or fused together for stability and to alleviate pain typically caused by a degenerated disc. *Id.*; A2075(1:60-63). The damaged disc between two vertebrae is removed (partially or

3

completely) and replaced with an implant, and the vertebrae on either side are fused together and fused to the implant. *Id*. Spinal fusion surgery—including minimally-invasive spine surgery through cannulas—was well known for decades before the 2002 priority date of the '782 patent. A2813(¶12); A1643-44(¶¶65-70); A1646-7(¶¶73-75).

Traditionally, spinal procedures were "open," which meant that the surgeon would make a large incision in the patient, and tissue and organs would be navigated to give the surgeon a clear view and easy access to the surgical site. A2813(¶10); A836(1:25-29). The main advantages of open procedures are that the surgeon has a clear view of the surgical site, and enough access to the site and room to maneuver the instruments. A2813-14.

The main disadvantages, however, are the harm and risks to the patient inherent in open spinal surgeries. A2814-15; A836(1:25-35); A6775. The spine is surrounded on all sides by muscle, organs, blood vessels, and nerves, which must be navigated for open surgery. A836(1:25-36). An open spinal surgery typically required a large incision, extensive stripping of muscle from bone, prolonged muscle retraction, loss of nerve supply, and loss of blood supply to nearby tissues. *Id*.; A6775. Open spinal surgeries also usually required general anesthesia for the entire hours-long procedure. A836(1:30-33). As a result, even successful open spinal procedures would often leave the patient with damaged tissue near the surgical site, scarring, and a lengthy, painful

4

recovery period of weeks or more. *Id*. For some patients, the drawbacks of open spinal surgery outweighed the benefits. *Id*.

Long before NuVasive's 2002 priority date, the disadvantages of open spinal fusion surgeries were well-known, and physicians had developed numerous alternatives. At least by the 1990s, physicians had developed several less invasive procedures—typically using smaller incisions, smaller specialized surgical instruments, and sensors and cameras to observe the surgical site. *See* A1644(¶69); A1647(¶75); A2813. The surgeon would make a small incision in the patient's body to create a narrow working corridor (essentially a small tunnel)—through which the surgeon could pass small-diameter microsurgical instruments to perform the procedure and a microscope and camera to observe the procedure. *Id.*; A2814(¶16). Minimally-invasive surgical procedures caused less collateral harm to patients, reduced complications and recovery times, and often required only local anesthesia rather than general. A836(1:36-46); A16442-43; A2814-15(¶16).

### 2. Methods and Instruments For Minimally-Invasive Spinal Procedures

At least as early as the 1990s, surgeons used tube-shaped instruments (cannulas) to create a narrow working corridor to the spine for minimally-invasive surgical procedures. A1643-44; A197-98. The surgeon would typically make a small needle-puncture-size incision in the patient, and gradually widen the opening by inserting progressively larger tubes (cannulas) to ultimately create a working corridor, through

which surgeons could insert surgical instruments and perform the surgery.

One such example is the prior art U.S. Patent No. 6,679,833 ("Smith," A805-54), entitled *Devices and Methods For Percutaneous Surgery*. Smith's figure 10 illustrates a procedure of creating a needle-puncture-size incision in the patient, and widening that opening by inserting progressively larger cannulas to create a working corridor for spinal surgery:



A862 (color added). *First*, as shown in Figure 10a, the surgeon makes a small incision in the skin, and inserts a guidewire 150 (green) through the tissue and anchors it into the bone (above: vertebra labeled V; laminae (outer layer of the bone) labeled

M); A841(12:27-51). *Second*, as shown in Figures 10b-10e, after placing the guidewire, the surgeon inserts a series of successively larger cannulas (or "dilators") (151-153, pink) over the guidewire to gradually widen (i.e., "dilate") the opening. *Id.* The narrowest cannula (151) is placed over the guidewire, then the next-narrowest cannula is placed over that cannula, and so on, one over the other until the opening is wide enough. *Id.* *Next*, in Figure 10e, the surgeon places the working channel cannula 20 (the largest cannula, highlighted blue) over the largest of the tissue dilators. *Finally*, in Figure 10f, the surgeon removes the guidewire 150 and dilators 151-153, leaving only the working-channel cannula 20. "With the cannula 20 in position, a working channel is formed between the skin of the patient to a working space adjacent the spine." A841(12:52-54).



A819 (Fig. 24) (color added). Once the working channel cannula is placed, the surgeon can operate by passing tools and instruments through the cannula, and can pass a "viewing element" (such as a fiber optic scope) through the cannula to observe

the surgical site and help guide the instruments.  A842(13:17-64).

The Smith patent also describes several instruments and techniques for creating a narrow channel to a surgical site and using small instruments and viewing elements to perform and observe the surgery.  A838-52; *see also* A807-35 (drawings).  Smith explains that its "devices and methods"—particularly the general concept of creating a narrow incision, widening it to a minimally-invasive working corridor, and performing surgery through the corridor with special small instruments and sensors—can be used in "all applications and approaches," A837(3:16-18), including "a wide range of surgical procedures, and particular spinal procedures."  A841(11:54-57). Smith discloses various "spinal applications," A838(6:44-48), and includes surgeries that approach the spine from all directions. A841(12:7-12); *see also id.* (12:1-2) (The "invention can also be used from any approach.").

### 3.    Nerve Monitoring Technology

Nerve monitoring (also referred to as neuromonitoring) technology—essentially determining when a patient's nerves are near the surgical instrument so that the surgeon can avoid damaging or contacting them during surgery—is also relevant to this appeal.

The need to avoid a patient's nerves during surgery has long been known, A1628; A4285-86.  By the 1980s, for example, surgeons could monitor a patient's nerves by sending an electrical current through the surgical instrument and watching

for a muscle twitch triggered by a firing nerve. A1636; A1618-20; A1631. The instrument would typically be entirely insulated except for the tip. A1636-37. When the tip of an electrified instrument came close to a nerve, the current would cause the nerve to fire, which would trigger a muscle twitch that could be seen with the naked eye. A1636; A1618-20; A1631. The surgeon could then adjust the electrical current and manipulate the instrument to pinpoint the location of the nerve and thereby avoid it. A1631; A1635.

Later in the 1980s, more advanced nerve-detection systems relied on computers, sensing electrodes, and stimulating electrodes rather than having surgeons watch for muscle twitches. A1631. Using a technique called electromyography ("EMG"), a sensing electrode could detect an electrical response of a muscle contraction, and send it to a display screen. *Id.* Some EMG systems detected nerves by using stimulating electrodes placed on the surgical instruments, and others used separate stimulating instruments whose sole purpose was to help detect nerves. A1631-32; A1636; A1619-20.

By the 1990s, surgeons were using nerve monitoring techniques in numerous applications, including minimally invasive spine surgeries. A1620 (¶¶14-16); A1632-36 (¶¶38-48); A1644 (¶69).

Kelleher (WO 01/037728, A1021-66) and Marino (WO 00/38574, A962-1020) are two examples of prior art EMG nerve monitoring systems used in spine surgery.

9

Kelleher recognizes the importance of avoiding a patient's nerves during surgery—especially spinal surgeries. A1023. Kelleher discloses "[a] method for detecting the presence of a nerve adjacent the distal end of at least one probe," A1021, using "an electrified surgical tool, probe, *cannula*, or other surgical instrument." A1032. Kelleher describes that nerves can be detected by passing electrical stimulus pulses through the electrified end of the probe or surgical tool, varying the intensity of the stimulus, and monitoring EMG responses at various muscles innervated by the at-risk nerves. A1038-39. By adjusting the intensity of the electrical stimulus, and observing the resulting EMG responses, a surgeon can approximate the distance between the surgical tool and the nerve. A1039-40.

Marino is likewise directed to nerve monitoring with minimally-invasive spinal surgery. A964 ("nerve surveillance systems and to cannulae systems for use in minimally invasive spinal surgery."). In one embodiment, Marino discloses placing multiple electrodes on the tip of a cannula to detect nerve proximity and so that nerves "can be avoided or gently moved out of the surgeon's way while inserting the cannula." A965.

Marino further discloses "an expandable tip nerve surveillance cannula system 110" having "an endoscopic hollow cannula shaft 112." A974. At one end of the cannula shaft 112 (shown below in pink) is an expandable tip 113 having electrodes 116 (yellow). *Id.* Marino describes the "important functions" of the electrodes as

10

including "to sense the presence and relative position of para-spinal nerves as cannula shaft 112 is advanced." A974-75. As the cannula is passed through the muscle tissue, the electrode will stimulate a nearby nerve "such that the presence of [the] nerve … can be detected by electromyography [EMG]." A975. By detecting the presence of a nearby nerve, the surgeon can move the cannula in a direction that would avoid the nerve, or in a direction that "gently moves [the] nerve … out of the way." *Id.* The placement of the electrodes 116 (yellow) on the end of the cannula 112 (pink) is shown below:



A1001(Fig. 13).

Marino and Kelleher both explain that the disclosed nerve monitoring

techniques and instruments can be used with a broad array of surgical instruments and procedures. *See, e.g.*, A1038 (Kelleher: invention can be used with "any manner of surgical tool, including (electrified) cannulae through which other surgical tools are introduced into the patient."); A979 (Marino: "the present expandable tip cannula can be used in all manner of minimally invasive surgery and is especially useful for approaching any target site having sensitive nerves").

Prior art methods of nerve detection added the ability for the user to detect the *direction* of the nerve relative to the instrument. A1642. Marino, for example, teaches that its techniques can be used to detect the presence *and location* of nerves. A974-75(11:32-12:12). Also, U.S. Patent No. 6,292,701 to Prass (A881-92) discloses a stimulating instrument with a flexible end that could be bent to direct the electrical stimulus at an angle. A888; A1641(¶60); A1659(¶120). A surgeon could observe whether the stimulus response is higher when the flexible end is turned to face one direction over another, which would indicate the direction of the nerve. *Id.*

### 4. Directions of Approach for Spinal Surgery

Also relevant to this appeal is the fact that surgeons can approach the spine from different directions during surgery. Making an incision to the spine from the front of the patient is referred to in the record as an "anterior approach." Accessing the spine from the patient's back is a "posterior" approach, from the side is the "lateral" approach, and diagonal approaches from various angles are "anterolateral" or

"posterolateral."  A2815-19(¶¶19-23).



**Top view of vertebra**
A2816 (some text and arrows added)

Any surgical direction of approaching the spine involved risks and tradeoffs. A2816-18(¶¶20-23).  Anterior approaches to the spine risk damage to major organs and the two largest blood vessels in the body (the aorta and vena cava), which may need to be pushed to the side.  A2816-17(¶20).  Posterior approaches risk damage to lower back muscles and nerve roots that must be retracted.  A2817(¶21).  A postero-lateral (from the back and side, at an angle) approach avoids some nerves, but provides less access to the discs between the vertebrae than an approach directly from the front or back.  A2817-18(¶22).  Finally, in the lumbar region of the spine (the five vertebrae in the lower back), lateral approaches from the patient's side may go

13

through a muscle called the psoas, which contains the lumbar plexus nerves that could be damaged if inadvertently contacted by an instrument during surgery.  A2818(¶23); A4285-86 (114:25-115:3); A5073-74 (109:20-110:20).

As experts for both parties agreed, every direction of approaching the spine involves tradeoffs, A2820(¶27); A2815-20(¶¶17-27); A689(47:11-14), and any surgeon would consider a range of factors specific to the patient and procedure before choosing the direction of approaching the spine.  A2819(¶24)("A surgeon will select one of the above lumbar interbody fusion techniques based on factors such as the preoperative deformity of the patient, the symptom (e.g., back or leg pain), the age of the patient, the size of the patient, the number of spinal levels to be fused, which spinal levels are to be fused, the stability of the spine, the degree of nerve compression, the quality of the patient's bone, and the overall medical condition of the patient."); *see also* A2819-20(¶¶25-26).

Before the 1990s, surgeons typically approached the spine from the back or the front, but rarely from the side.  A262; A4229(58:4-11).  By the critical date of the patent, however, direct lateral and postero-lateral approaches to the spine—including through the psoas muscle if necessary—were known.  *Id.*  NuVasive conceded below that "lateral approaches to the spine (i.e., creating an operative corridor through the patient's side—as opposed to front or back—to perform a procedure on the spine) have long been known, going back at least to the early 1980's…."  A262.

14

Obenchain (U.S. Patent No. 5,195,541, A874-880), for instance, discloses a minimally-invasive surgical procedure on the lumbar region of the spine that can be done using a lateral approach. Obenchain describes how a surgeon can create a working corridor by directing surgical instruments "through an abdominal incision, for example, immediately above the pubic bone." A879. Obenchain discloses that the surgeon may create the working corridor 12 [blue] "to the left of aorta 81 and inferior vena cava 82, between the aorta and the psoas muscle 86 [red], and through the posterior peritoneum 87 and fatty tissue 85" as shown below. A880.



A874(Fig. 8) (color added). Obenchain also discloses that: "If desired, the surgery may traverse through the psoas muscle." *Id*; *see also* A4456-57 (49:15-50:12); A4461-62 (54:24-56:3). "[F]or example, where the pat[i]ent has extensive abdominal

adhesions, it may be preferred to use a lateral puncture of the abdomen to avoid bowel perforation, and entry into the disc space is lateral, transversing the psoas muscle, or immediately in front of it." A880(5:9-14); *see also* A451.

## B.    The '782 Patent

The '782 patent is titled *System and Methods for Performing Surgical Procedures and Assessments*, A49, and claims a priority date of September 25, 2002. A85.  The '782 patent claims systems of instruments used in minimally-invasive spinal surgery.  The claims combine sequentially-dilating cannulas with nerve-monitoring, A98, both of which were well-known in the field of spinal surgery well before the patent's priority date. *See Statement of the Case § I.A, supra.*

### 1.    Written Description

The summary of the invention states that the '782 patent is directed to three problems:  (a) determining the proximity and direction of nerves near surgical instruments, (b) assessing the health of nerves, and (c) assessing whether the pedicle (part of a vertebra) has been damaged before, during, or after the placement of a pedicle screw.  A85-86(2:56-3:4).  The written description discusses performing minimally-invasive spinal surgery using known cannula instruments with electrodes to detect nerves in the surgical path using known neural monitoring technology such as EMG.  A86(3:5-17); A88(7:44-64).

One embodiment discussed in the written description is a "sequential dilation

16

access system," shown in Figure 18, below.  Much like the Smith prior art patent, the

'782 patent contains a guidewire 46 (green), a series of sequentially larger-diameter

dilating cannulas 48 (pink), and a working cannula 50 (blue):



A68(Fig. 18, color added).  Again, like the Smith patent, the '782 patent describes the

creation of a working surgical corridor by inserting the guidewire into the patient and

gradually widening the incision by inserting progressively larger cannulas.

A94(19:60-20:45); *compare, e.g., id., with* A841(12:27-51).

The system also includes stimulation electrodes 70 (yellow) on the tip of the

guidewire 46 (green), and on the tip of a sequential dilator 48 (pink), shown in Figure

16, below (A66).  *See also* A94(19:67–20:5) (describing same).

17



A66(Fig. 16, color added). The electrodes emit electrical pulses that cause nearby nerves to fire, producing an EMG response. A90(11:22–27). Each electrode is positioned at an angle, which allows the user to detect both a nerve's proximity and direction relative to the surgical instrument, A94(20:5–21), and thus to avoid nerves in the surgical path. A90(11:27-35).

For these proceedings, NuVasive has described the '782 patent as focused on direct lateral, "trans-psoas" approaches to the lumbar spine. NuVasive Opening Br. at 2; *id*. at 36-37; A681(39:1-17); A755-56(113:1-114:23). The '782 patent, however, consistently describes the disclosed systems and methods as useful for a *range* of procedures and approaches to the spine. A49, A85(1:22-58); A85-86 (2:62-3:4); A86(3:5-26). In the two places where the written description uses the terms "lateral"

and "psoas," it refers to approaching the spine from the back at an angle ("postero-lateral"), not directly lateral. *See* A90(11:35-39) ("particularly suited for establishing an operative corridor … in a postero-lateral, trans-psoas fashion so as to avoid the bony posterior elements of the spinal column"); A94(20:25-29) (A guide wire and dilator "progress towards an interveterbral target site in a postero-lateral, trans-psoas fashion so as to avoid the bony posterior elements of the spinal column.").

> ### 2. Claims

The claims at issue in this appeal are 1, 5, 7-9, 13-18, and 20. Claims 1 and 9 are the only independent claims. Claim 1 is representative. It is a system claim that recites three primary features: (i) dilating cannulas, (ii) stimulating electrodes for nerve monitoring, and (iii) a working corridor instrument, and adds that the system is intended "to form a trans-psoas corridor between a skin surface and a targeted spine site":

> 1. A surgical system for neural monitoring while forming an operative corridor in a trans-psoas approach to a spine, comprising:
>
> **[i]** a sequential dilation access system comprising a plurality of dilating cannulas to form a trans-psoas corridor between a skin surface and a targeted spine site, the plurality of dilating cannulas comprising an outer dilating cannula fitting over another of the dilating cannulas when advanced in a trans-psoas path toward the targeted spine site,
>
> **[ii]** wherein a stimulating electrode is positioned on at least one of the dilating cannulas to deliver a stimulation signal for nerve monitoring proximate to a distal end of the dilating cannula when

19

advanced in the trans-psoas path, the stimulation electrode being arranged in a fixed position relative to a longitudinal axis of the at least one dilating cannula such that the stimulation electrode rotates with the at least one dilating cannula when the at least one dilating cannula is rotated about the longitudinal axis;

**[iii]** a working corridor instrument that is slidable over the outer dilating cannula to form a trans-psoas operative corridor to the targeted spine site.

A98 (roman numerals added). Claim 9 is also a system claim and is worded similarly.

*Id.*

## II.    *Inter Partes* Review Proceedings

### A.    The Board's Institution Decision

Medtronic's petition challenged the patentability of claims 1, 5, 7-9, 13-18, and 20, A185-249, and explained, for each individual claim and prior art combination, how a person of skill in the art would have been motivated to combine prior art teachings to arrive at the claimed systems. A206-49.

After receiving a preliminary response from NuVasive, the Board instituted IPR proceedings on a subset of the grounds in Medtronic's petition. A353-54. As instituted by the Board, each claim was subject to challenge on two grounds: (a) obvious over combinations of Smith (A805-54), Marino (A962-1020), and Obenchain (A874-880), and including additional references for certain dependent claims, and (b) obvious over combinations of Foley (A855-73), Kelleher (A1021-66), Obenchain, and Prass (A881-92), likewise including additional references for certain dependent claims. *See* A353-54.

20

Two other aspects of the institution decision are relevant to this appeal. *First*, the Board construed the terms "trans-psoas approach" and "when advanced in the trans-psoas path" —which appear in both independent claims—as statements of intended use rather than claim limitations. A329. Thus, the Board concluded, those terms are "entitled to no patentable weight, beyond an ability to follow a 'trans-psoas path' or 'trans-psoas approach.'" A330.

*Second*, the Board addressed an argument from NuVasive that, although Obenchain expressly discloses lateral spinal surgery through the psoas muscle, Obenchain really only discloses going through a "safer zone" of the psoas. A338 (institution decision quoting and citing A282-84 (prelim. response)). The Board first noted that, under its construction, the "trans-psoas" claim terms do not carry patentable weight beyond the ability of the claimed cannulas to follow a "trans-psoas path." A339. The Board thus rejected NuVasive's argument that any "specific trans-psoas trajectory distinguishes Obenchain from the claimed system." A339. The Board also held that, "even if the term carried patentable weight, [NuVasive] has not explained with sufficient detail how Obenchain teaches a 'safer zone' than what allegedly is taught in the '782 patent, or why a distinction among various zones of the psoas is relevant to a claim that refers to a 'trans-psoas' path or approach without specifying a zone." *Id.*

21

### B.    The Board's Final Written Decision

After discovery, additional briefing, and oral argument, the Board issued a final written decision finding claims 1, 5, 7–9, 13–18, and 20 unpatentable as obvious. A47.  Each claim was invalid in light of the two instituted combinations of prior art: (1) Smith, Marino, and Obenchain, with additional references for certain dependent claims, and (2) Foley, Kelleher, Obenchain, and Prass, also with additional references for certain dependent claims.  *Id.*

### 1.    Construction of the "Trans-Psoas" Claim Terms

The Board reaffirmed the ruling from its institution decision that the "trans-psoas" claim terms were "statements of intended use and are entitled to no patentable weight, beyond requiring an ability to follow a 'trans-psoas path' or 'trans-psoas approach.'"  A7; *see also* A329-30.  The Board noted that "Petitioner and Patent Owner do not dispute these constructions," and reaffirmed those constructions "upon consideration of the complete record developed during this trial."  A7.

### 2.    Obviousness Analysis

### a.    Secondary Considerations

NuVasive's patent owner response relied primarily on secondary considerations.  A418-43.  According to its regulatory filings, NuVasive owned 111 issued patents by the end of 2009, and 395 by the end of 2013 (the '782 patent issued in 2011).  A6785; A3451.  "XLIF" is one of NuVasive's 201 registered trademarks. A6785. "XLIF" stands for "eXtreme Lateral Interbody Fusion."  A6772.  Beginning in

2001, "XLIF" referred to a posterolateral spinal surgical procedure that is "completely different" from what NuVasive now calls "XLIF." A2938-40(406:3-408:11). For a short time, there were "two XLIF procedures at NuVasive"—"XLIF 60" and "XLIF90." A2938(406:3-6). "XLIF 60" was the posterolateral procedure initially marketed as "XLIF." A2938-2940(406:24-408:4); A2984-85(455:13-455:6); A3016-17(487:9-488:12). "XLIF 90" was a direct lateral procedure that came to be called "XLIF" after "XLIF 60" was discontinued. A2987(458:8-18). NuVasive now uses the term "XLIF" to refer to a directly-lateral-approach spinal surgical procedure and to a range of products and processes associated with that procedure. A6250-77. By the end of 2009, NuVasive's "XLIF patent portfolio" "includ[ed] 56 U.S. utility patent applications … covering various additional aspects of XLIF methodology, implants, and systems." A3451.

NuVasive never argued that invention of the '782 patent was critical to its "XLIF" procedure and products, or that it was more important than NuVasive's numerous other "XLIF"-related patents. Rather, NuVasive stated that "[t]he '782 patent is *one of many* owned by Patent Owner NuVasive that protects its pioneering eXtreme Lateral Interbody Fusion ("XLIF") systems and method." A412. NuVasive then proceeded to equate "XLIF" and the '782 patent for purposes of its secondary considerations arguments, and to argue that the history and profitability of NuVasive's "XLIF" products and procedures should be regarded as powerful evidence of the

23

nonobviousness of claims 1, 5, 7-9, 13-18, and 20 of the '782 patent.  A418-43.

Indeed, NuVasive went so far as to argue that its company-wide corporate revenues

were evidence that those claims were not obvious.  *See, e.g.*, A438 ("It is undisputed

that NuVasive's meteoric growth is the direct result of its XLIF procedure and

systems and the technology claimed by the '782 patent."); NuVasive Opening Br. at

22-25 (similar).

The Board considered NuVasive's evidence and arguments at length and

explained, in detail, why it viewed that evidence as entitled to "little weight."  A26-39.

Among other things, the Board found that NuVasive did not establish a nexus between

its evidence and the allegedly novel features of the '782 patent claims.  A26-29.  For

example, NuVasive never explained precisely what "XLIF" was, whether or to what

extent products and processes NuVasive referred to as "XLIF" practiced the claims of

the '782 patent, or what particular importance the invention of the '782 patent did or

did not have among NuVasive's numerous "XLIF" patents.  A26-28.  Evidence

reflected that "XLIF" was a marketing term that included surgical instruments other

than the claimed cannulated devices with nerve monitoring capability, A27-28, and

that included both products (e.g., implants) that were not part of the claims and

surgical techniques that were not part of the claims.  *Id.*  The Board also relied on the

fact that NuVasive was asserting the same evidence of secondary considerations

across a wide variety of different patents claiming different inventions in different

24

proceedings (including for implant patents) as further support that the evidence here was entitled to little weight. A35-36. Without any persuasive connection between NuVasive's "secondary considerations" evidence, and any allegedly novel features of claims 1, 5, 7-9, 13-18, and 20 of the '782 patent, the Board found that that evidence was "entitled to little weight." A29.

Even setting aside the absence of a nexus, the Board considered NuVasive's evidence with evident care, piece by piece, and found it generally unpersuasive. A29-39.

### b.    Combination of Smith, Marino, and Obenchain

The Board found that the combination of Smith, Marino, and Obenchain disclosed all elements of claim 1 of the '782 patent, and that a person of ordinary skill in the art would have been motivated to combine them to arrive at the claimed system. A14. As to the claim elements, "Smith teaches a sequential dilation access system with a plurality of cannulas and a working corridor instrument," "Marino teaches providing stimulation electrodes in fixed positions on cannulas for nerve monitoring when performing surgery in areas containing sensitive nerves," and "Obenchain teaches spinal surgery using a transpsoas approach." *Id.*

Further, the teachings of all three references are in the same specific field of minimally-invasive spine surgery using cannulated instruments. *Id.* The Board credited Medtronic's evidence that one of skill in the art would have had a reason—

25

the very safety purposes for which cannulated instruments and nerve monitoring exist in the first place—to combine the nerve-monitoring electrodes disclosed in Marino with the cannulated instruments of Smith when taking the approach through the psoas of Obenchain. *Id.* The Board found that the motivation was Marino's explicit "teaching of the importance of monitoring for, and avoiding, nerves near a cannula as it is inserted to the intervertebral space." *Id.*; *see also* A1646-49(¶¶73-84).

The Board rejected NuVasive's argument that one of skill would have no motivation to combine the prior art "because Obenchain does not teach traversing the nerve-rich portions of the psoas muscle." *Id.* The Board noted that the "trans-psoas" claim terms were undisputedly not claim limitations, *id.*, and that, regardless, Smith disclosed instruments that could be used in "any approach," including laterally through the psoas, A15(citing A1646-48(¶¶74-80)), and Obenchain expressly disclosed use of cannulated instruments through the trans-psoas path. *Id.* The Board considered, but did not credit, NuVasive's declaration testimony of Dr. Obenchain, the named inventor of the Obenchain patent and a paid witness for NuVasive. *Id.*[1]

### c.   Combination of Foley, Kelleher, Obenchain, and Prass

For combinations based on Foley, Kelleher, Obenchain, and Prass, NuVasive

---

[1] The Board also analyzed additional prior art combinations for certain of the other claims of the '782 patent. On appeal, NuVasive does not argue that any further limitations of the dependent claims render those claims non-obvious.

incorporated by reference the arguments it made against combining Smith, Marino, and Obenchain. A42. The Board considered those combinations thoroughly, A40-46, and considered and rejected NuVasive's incorporated arguments. A42. The Board found that the combination of Foley, Kelleher, Obenchain, and Prass disclosed every limitation of claim 1 of the '782 patent, and that the evidence established a motivation to combine. A41-42. For the combinations based on Foley, the Board found that Kelleher provided an explicit motivation to combine, as Kelleher "explains the importance of using nerve monitoring technology in surgery to avoid nerve damage." A41 (citing A1023-1024 and A1030).

In sum, the Board found that each of claims 1, 5, 7-9, 13-18, and 20 of the '782 patent was obvious in light of two combinations of prior art references. A47.

## STANDARD OF REVIEW

Obviousness is a question of law based on underlying findings of fact. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *Merck & CIE v. Gnosis S.P.A.*, 808 F.3d 829, 837 (Fed. Cir. 2015). The weighing of secondary considerations evidence, and the question of whether a person of ordinary skill in the art would have been motivated to combine prior art teachings, are questions of fact. *Merck*, 808 F.3d at 837. This Court reviews such factual findings for substantial evidence, and the Board's ultimate conclusion of obviousness *de novo*. *Id.*

"Substantial evidence" is a deferential standard that the Supreme Court has

27

analogized to review of a jury's fact findings. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Dickinson v. Zurko*, 527 U.S. 150, 162 (1999); *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085 (Fed. Cir. 2000).

## SUMMARY OF THE ARGUMENT

1.    Substantial evidence amply supports the Board's finding of a motivation to combine the prior art.  As an initial matter, NuVasive's arguments seek to distinguish the claims from the prior art based on something not claimed: a direct lateral path through the psoas muscle.  The distinction is legally irrelevant. Regardless, however, the nerve monitoring references Marino and Kelleher teach that nerve monitoring should be used when conducting minimally invasive spinal surgery in order to detect unseen nerves and avoid possible nerve damage.  Those references broadly and explicitly teach the use of nerve monitoring to promote safety in *any* approach to the spine, and are therefore more than sufficient to uphold the Board's factual finding of a motivation to combine.

In any event, the record established that there was nothing new about taking an approach through the psoas muscle.  Obenchain disclosed traversing the psoas muscle in minimally invasive spinal surgery, and the Board properly rejected NuVasive's factual arguments that Obenchain did not disclose traversing the *nerve-rich* portion of

the psoas. At bottom, the '782 claims recite a combination of known elements according to their established function to achieve a predictable result—promoting safety by avoiding nerve damage. Under such circumstances, the motivation is self-evident, and nothing more is required. *KSR*, 550 U.S. at 401.

2.    Substantial evidence also amply supports the Board's determination that NuVasive's secondary considerations evidence did not establish non-obviousness. The Board carefully considered NuVasive's evidence and found it lacking in several key respects. It found little, if any, nexus between the claimed invention and NuVasive's XLIF procedure. Not only did NuVasive's own documents indicate that XLIF is much more than a set of instruments with nerve monitoring, as recited in the '782 claims, but NuVasive itself repeatedly pointed to key features attributable to XLIF's success that are not recited in the claims. In fact, NuVasive loans the instruments recited in the claims *at no cost*, and instead makes money selling specialty disposables and implants that are not covered by the '782 patent claims. NuVasive's other evidence was just as suspect, as the Board correctly found.

NuVasive's inability to establish a nexus is even more evident when viewing the related appeals together. In every single one, NuVasive tries to attribute the entire success of the XLIF procedure to each of the four different patents involved in these appeals and to implant patents involved in other appeals, without ever apportioning any of that success between the different claimed inventions. In other words,

29

NuVasive attributes the *same* success to different features in different patents in different IPR proceedings.  By overreaching in that way, NuVasive reveals that XLIF and its alleged success is not truly linked to *any* of the claimed inventions particularly, and certainly not to a degree that compels overturning the Board's finding of obviousness.

## ARGUMENT

The Board weighed the parties' evidence and arguments in the manner this Court's precedents require, and found that claims 1, 5, 7-9, 13-18, and 20 of the '782 patent obvious in light of the prior art combinations of record.  Substantial evidence— "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Consol. Edison*, 305 U.S. at 229—supports the Board's findings.  On appeal, NuVasive reargues its view of the facts while criticizing the Board's consideration of the prior art and of NuVasive's "secondary consideration" evidence.

Most of NuVasive's arguments attempt to conjure legal issues from the Board's application of settled law to the facts in a thorough, 47-page opinion.  Wherever the Board did not find a specific piece of NuVasive's evidence persuasive or compelling, the Board gave specific reasons.  Indeed, the Board considered the parties' evidence and argument point-by-point, so NuVasive now argues on appeal (in a cursory three-sentence argument section) that the Board must have "[e]rred by not considering the evidence as a whole."  NuVasive Opening Br. at 64.  Likewise, NuVasive accuses the

Board (some 21 times in its 64-page brief) of "disregarding" its evidence or of inventing new legal requirements. It did nothing of the sort—NuVasive accuses the Board of "disregarding" evidence that the Board found unpersuasive. NuVasive is simply rearguing a view of the facts that the Board was entitled to, and thoroughly did, reject. NuVasive fails to identify any reversible error, and the Board's decision should be affirmed.

## I. Substantial Evidence Supports The Board's Finding That One Of Skill In The Art Would Have Been Motivated To Combine Standard, Known Nerve-Monitoring Technology With Standard, Known Surgical Tools

A claim is unpatentable "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103 (2006).[2] Generally, a patent is obvious if a skilled artisan would have had reason to combine the teachings of prior art references to achieve the claimed invention, and would have had a reasonable expectation of success from doing so. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068-69 (Fed. Cir. 2012). In *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), the Supreme Court observed that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results," and that "if a technique has been used to improve one device, and

---

[2] The pre-AIA version of 35 U.S.C. § 103 applies to this patent.

a person of skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* at 416, 417. Both observations describe this case.

Here, every element of the '782 patent claims is specifically disclosed in the prior art *in the specific context of minimally-invasive spinal surgery*, and there is no evidence that those elements were thought to be incompatible or mutually exclusive, or that there was anything novel about using them together—quite the opposite. The elements of the '782 patent claims—dilating cannulas and a working corridor cannula, and nerve monitoring—address two specific and related concerns that inherently arise in minimally-invasive spinal surgery. The prior art discloses using those precise elements to address those precise concerns, specifically in the field of minimally-invasive spinal surgery. That should be the end of the matter.

Specifically, Smith discloses dilating cannulas and a working corridor cannula used in minimally invasive spinal procedures from "any approach." A841(12:1-2); A837(3:16-18); A1643-44(¶¶67-70); A1646-49(¶¶73-84). As the Smith patent explains, the technique of creating a small incision for a guidewire and gradually widening the incision into a working corridor through a series of progressively larger cannulas is broadly useful as an alternative to all types of open surgery. A841(12:27-51); *id*.(11:54-60). Smith discloses that technique both generally and in the specific context of minimally-invasive spinal surgery. *Id*.(11:54-12:2). Similarly, Foley

discloses sequentially dilating cannulas and a working corridor cannula for minimally invasive spinal procedures. A868(10:12-50); A1643-44(¶¶67-70); A1649-52(¶¶85-97). Like Smith, Foley discloses its technique in the context of minimally invasive surgery from "any approach," but also "has application to a wide range of surgical procedures." A868(9:63-66, 10:10-11); A1649-52(¶¶85-97). And, if more is needed, Obenchain specifically discusses the use of the same technique in minimally-invasive spinal surgery using a "trans-psoas path" to the spine. A880(5:5-14); A1646-47(¶¶73-77); *see also Statement of the Case §I.A.2, supra*.

Marino likewise discloses a broadly useful technique (nerve monitoring) both generally and in the specific context of minimally-invasive spinal surgery with cannulated instruments. A964-65; A973-75; A979; A1646-49(¶¶73-84). Kelleher and Prass do as well. A1021-24; A1038-39; A888; A1641(¶60); A1659(¶120). Marino expressly recognizes the risk of damaging nerves during surgery, and tells one of skill in the art precisely why to equip surgical instruments with nerve-monitoring technology: to avoid inadvertently damaging an undetected nerve and thereby harming the patient. A973 ("nerve 20 can then be gently pushed out of the way, *providing safe access to the patient's intervertebral space*"); *id.* ("push the nerve out of the way such that a cannula can then be advanced past nerve 20 *without damaging the nerve*"); A964-65; A1648-49 (¶¶80-83).

The Board was thus amply entitled to find, as it did, that NuVasive's patent

claims were obvious in light of combinations based on Smith and Foley. Those findings are supported by substantial evidence and should be affirmed.

### A.    The Board Properly Considered the "Trans-Psoas" Claim Terms

Much of NuVasive's appeal disputes the Board's finding that the "trans-psoas path" claim terms are not entitled to patentable weight. NuVasive Opening Br. Argument § II.C. Yet NuVasive did not argue to the Board that the "trans-psoas" claim terms limited the scope of the claims, *see* A8 ("Petitioner and Patent Owner do not dispute these constructions."); A681(39:10-23), nor does it appear to make that argument now. Rather, consistent with the obviousness statute's focus on "the differences between *the claimed invention* and the prior art," it is well-established that claims cannot be distinguished from the prior art on the basis of unclaimed features. *Smith & Nephew, Inc. v. Rea*, 721 F.3d 1371, 1381-82 (Fed. Cir. 2013) ("an unclaimed and undisclosed feature … cannot be the basis for finding Synthes's patent to be non-obvious over the prior art"); *Soverain Software LLC v. Newegg Inc.*, 705 F.3d 1333, 1339 (Fed. Cir. 2013) (A "distinction … not embodied in the claims and not reflected in the claim construction" cannot be the basis of a nonobviousness argument.), *reaff'd on reh'g*, 728 F.3d 1332, 1335 (Fed. Cir. 2013); *In re Thompson*, 545 F.2d 1290, 1295 (C.C.P.A. 1976) ("[L]imitations not found in the claims are relied on … and these cannot be the basis for patentability."). Traversing the psoas muscle using a *directly* lateral approach (or only traversing a certain portion of the

psoas muscle)—*is not claimed*, and thus cannot be a basis for distinguishing the prior art for obviousness purposes.

NuVasive nonetheless resists that conclusion by citing *In re Sullivan*, 498 F.3d 1345 (Fed. Cir. 2007), and arguing that the Board erroneously "disregard[ed] argument and evidence relating to the unexpected use of the claimed surgical system." NuVasive Opening Br. at 47; *see also id.* at 48-49. NuVasive misapprehends the Board's decision and misapplies *Sullivan*.

In *Sullivan*, a patent applicant claimed a novel pharmaceutical composition and argued—with supporting declarations—that the composition was nonobvious in part because it had the unexpected property of neutralizing snake venom. 498 F.3d at 1348-49. The Board explicitly disregarded that evidence and argument, stating "we do not address these arguments or the Declarations" because they related only to an intended use for the composition. *Id.* at 1350. This Court vacated and remanded, noting that the evidence of an unexpected use for a new composition was relevant secondary considerations evidence and should have been considered. *Id.* at 1353 ("The issue here is not whether a claim recites a new use, but whether the subject matter of the claim possesses an unexpected use.").

Nothing similar happened in this case. As explained in greater detail below, *Argument § II, infra*, the Board did not "disregard" any of NuVasive's evidence; it thoroughly considered that evidence and simply found it unpersuasive. NuVasive

35

repeats several times in its brief that the '782 patent "unexpectedly enable[d] a trans-psoas path." *See, e.g.*, NuVasive Opening Br. at 48. That is NuVasive's poorly-supported, conclusory view of the facts, and the Board was entitled to find otherwise. NuVasive conceded below that it did not invent "trans-psoas" spinal surgery and that it was known at the time of its invention to traverse the psoas muscle to perform minimally-invasive spinal surgery. A262; A415-16; A420; A451; A5826-28(¶45). And Obenchain specifically discloses a minimally-invasive surgical procedure that traverses the psoas. A15-16 (Board referring to the "general teaching in the Obenchain reference of traversing the psoas muscle"). The Board was not required to find that a "trans-psoas path" was neither "unexpected" nor uniquely "enabled" by the '782 patent. Rather, the Board was entitled to find that NuVasive's patent merely claimed "[t]he combination of familiar elements according to known methods . . . [to do] no more than yield predictable results." *KSR*, 550 U.S. at 416. The Board did not "disregard" NuVasive's evidence; it was simply not persuaded.

### B.    Regardless of the Import of the Trans-Psoas Terms, Substantial Evidence Supports The Board's Finding Of A Motivation To Combine

The Board properly found evidence showing a motivation to combine. An obviousness analysis must apply "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness," but the tribunal "need not seek out precise teachings directed to the specific subject matter of the challenged

36

claim." *KSR*, 550 U.S. at 418. A motivation to combine may come from "a design need or market pressure to solve a problem," and need not be explicit. *Id.* at 421; *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1360 (Fed. Cir. 2015).

This is a textbook case of obviousness. It is undisputed that all of the elements in NuVasive's claims were disclosed in the prior art: known surgical instruments for minimally-invasive *spinal* surgery (Smith, Foley), known nerve monitoring technology with similar instruments (Marino, Kelleher, Prass), and techniques of approaching the spine through the psoas muscle (Obenchain, NuVasive's concessions). Although other approaches to the spine were more common, NuVasive does not contend that it invented lateral spinal surgery, nor does it dispute that, in certain cases and for certain patients, traversing the psoas muscle was unavoidable. A2819-20(¶¶24-27); A880(5:5-14). Nor can NuVasive deny the "problems" of not detecting and not avoiding nerves during spinal surgery (of any approach) were known—indeed, they were identified and addressed in the prior art. The prior art disclosed instruments and nerve monitoring technology in the field of minimally-invasive spinal surgery, and NuVasive's combination of those elements for minimally invasive surgery is nothing more than "[t]he combination of familiar elements according to known methods," *KSR*, 550 U.S. at 416. NuVasive's contrary arguments are without merit.

### 1.    Marino And Kelleher Disclose The Motivation To Combine

In arguing that no motivation to combine was shown, NuVasive focuses on Obenchain.  *See, e.g.*, NuVasive Opening Br. at 40 ("There is no substantial evidence of a reason to combine because it is undisputed that Obenchain discloses only incidental traversal of the psoas").  NuVasive is wrong about that, *see § I.B.2, infra*, but more importantly, NuVasive ignores that neither Medtronic's arguments nor the Board's analysis depended on Obenchain for the motivation to combine.    The references that taught the use of nerve monitoring with cannulas and other minimally-invasive surgical tools (Marino and Kelleher) amply supplied that motivation, as the Board found.  A14, A41-42.  To be clear, the claims at issue are *apparatus* claims.  Here, the basic apparatus is substantially disclosed in Smith and Foley, and both Marino and Kelleher provide the teaching and motivation to add nerve monitoring to such an apparatus for use in the very same field—minimally-invasive spinal surgery.

Marino states that it would be beneficial to use nerve monitoring when performing any minimally invasive spinal surgery and any approach: "A *significant danger* of performing intervertebral operations or accessing an intervertebral space during spine surgery is that of inadvertently contacting or damaging the para-spinal nerves, including the exiting nerve roots, traversing nerves and the nerves of the cauda equina."  A964-65.  Marino acknowledges that "[t]he exact location of these para-spinal nerves can not be determined prior to the commencement of surgery," and that

certain sensitive nerves are disposed at "unpredictable" locations." A964. "Accordingly, the *danger of pinching or damaging spinal nerves when accessing an intervertebral space* has proven to be quite limiting to the methods and devices used during minimally invasive spinal surgery." *Id.*

To alleviate that danger and promote safety, Marino discloses the use of "[an] expandable tip cannula system" that serves "both as an access portal for spinal surgery and as a system for nerve surveillance" to avoid nerves when creating the surgical corridor. A965. Marino states that the "advantage" of such a system "is that the para-spinal nerve can be avoided or gently moved out of the surgeon's way while inserting the cannula." *Id.* By doing so, Marino's system "provid[es] safe access to the patient's intervertebral space," allowing the cannula to "be advanced past nerve[s] … without damaging the nerve." A973.

In addition to the express motivation to combine from Marino itself, Medtronic's expert, Dr. Schwartz, testified that one of skill in the art would have had reason to combine the instruments disclosed in Smith with the nerve monitoring of Marino in view of Marino's teaching that its nerve-monitoring system "was intended to avoid nerve damage" in all types of minimally invasive surgeries. A1648-1649(¶¶80-83). Dr. Schwartz further explained that, by the time of the '782 patent, it was already well known to use stimulated instruments when performing surgeries where nerves were at risk, and that all of the lumbar spinal surgeries described in

Marino, Smith and Obenchain were surgeries that were known to present such a risk. *Id.*(¶83). Dr. Schwartz thus opined that one of skill in the art would be motivated to use the stimulating electrode of Marino with dilating cannulas of Smith in *any* approach to the spine, not just in a direct lateral approach. *Id*; *see also* A1650; A1653; A1655; A1669; A1680.

Kelleher likewise discloses nerve-monitoring and also contains an express suggestion to use such nerve-monitoring with surgical instruments (such as cannulas) in a minimally-invasive spinal surgery. Like Marino, Kelleher recognizes that the "downside" of all minimally-invasive procedures is that they "tend to offer a somewhat reduced visibility of the patient's tissues during the surgery. Accordingly, *the danger of inadvertently contacting and/or severing a patient's nerves can be increased.*" A1023(1:20-24). Kelleher also discusses the "importan[ce]" of avoiding unintentional contact with nerves during surgery, and "especially" during minimally-invasive spinal surgery. A1023(1:13-19). Kelleher thus teaches that it is desirable to maintain a "safety distance margin between the surgical tool and the nerve" when a "surgical tool is advanced into the patient's body." A1023-24(1:32–2:2); *see also* A1030(8:9–12) ("For example, as the operating (electrified) cannula is advanced into the patient, this operating cannula itself functions as a nerve detection probe. As such, the operating cannula can be advanced to the operating site without causing any nerve damage.").

40

As he did with Marino, Dr. Schwartz testified that one of skill in the art would have had reason to combine Kelleher with the cannulated instruments of Foley, for the same reason that Kelleher expressly discloses:  safety.  A1651-1652(¶¶90-96); *see also* A4510-11 (103:22-104:6).  That evidence—including both the express statements in the prior art references, and the supporting testimony of Medtronic's expert—persuaded the Board, A14-18, A41-43, and provides an abundant basis to affirm.

NuVasive attempts to dismiss that evidence as "generic statements," NuVasive Opening Br. at 43, but that is nothing more than NuVasive's expression of disagreement, and it is an inaccurate characterization of the evidence.  Far from "generic," the teachings of the prior art references provide one of skill with the precise reasons and roadmap to take the nerve-monitoring technology disclosed in Marino and Kelleher and combine it with *any* surgical instrument used in minimally-invasive surgeries generally, and minimally-invasive spinal surgeries "especially."  A964-95; A1023-24.

Even accepting NuVasive's suggestion that the authors of the prior art references might have preferred approaches to the spine other than the direct lateral approach, "a reference must be considered for *everything it teaches* by way of technology and is not limited to the particular invention it is describing and attempting to protect."  *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1076 (Fed. Cir. 2015) (reversing nonobviousness ruling); *In re Mouttet*, 686 F.3d 1322, 1331-32 (Fed. Cir.

41

2012) (similar, affirming obviousness ruling). What prior art discloses to a person of skill in the art, and the existence of a motivation to combine, are questions of fact that this Court reviews with deference. *Merck*, 808 F.3d at 837. The Board was entitled to credit Medtronic's evidence on this point, and NuVasive fails to demonstrate error. In any event, the claimed apparatus is not limited to the direct lateral approach.

### 2.    Obenchain Broadly Discloses Any Path Through The Psoas Muscle, Further Bolstering The Obviousness Determination

Although not necessary to affirm the Board's determination of obviousness, substantial evidence supports the Board's finding that Obenchain's disclosure to a person of skill in the art is not limited to a surgical path through the "safe zone" of the psoas.

Obenchain states broadly and without restriction: "If desired, the surgery may traverse *through the psoas muscle*." A880(5:5-6). "[F]or example, where the pat[i]ent has extensive abdominal adhesions, it may be preferred to use a lateral puncture of the abdomen to avoid bowel perforation, and entry into the disc space is *lateral*, *traversing the psoas muscle*, or immediately in front of it." *Id.*(5:9-14). NuVasive argued that one of skill reading Obenchain would necessarily understand that Obenchain was only talking about the "safe zone" of the psoas, but the Board was not required to accept that. Indeed, if the Board had read Obenchain so narrowly, that would likely have been error. Consistent with *KSR*'s admonition that "a person of ordinary skill is … not an automaton," this Court has frequently reminded the Board

42

and litigants that "a reference may be read for *all* that it teaches, including uses beyond its primary purpose." *Mouttet*, 686 F.3d at 1331-32; *see also Belden*, 805 F.3d at 1076 (the Board's narrow reading of a reference "violates the principle that 'a reference must be considered for *everything it teaches* by way of technology and is not limited to the particular invention it is describing and attempting to protect.'")

NuVasive notes that it offered a declaration from Dr. Obenchain—who NuVasive hired as a paid consultant—in which he attempted to limit the otherwise broad disclosure of his patent. But the Board was not required to give that declaration significant weight, or even to credit it. A15-16. Given the undisputed facts that (1) it was well known that one would encounter nerves when traversing the psoas, A5801(¶18); A4285-86(114:25-115:3); A5073-74(109:20-110:20); A6030-31(¶17), and (2) nerve monitoring technology addresses the problem of encountering nerves during minimally-invasive surgery, the Board was amply entitled to rely on Obenchain's explicit disclosure of minimally-invasive spinal surgery that traversed the psoas to show a motivation to combine nerve monitoring instruments with other similar minimally-invasive surgical instruments. The Board's ruling is supported by substantial evidence, and NuVasive fails to show otherwise.

## II.   Substantial Evidence Supports The Board's Finding That NuVasive's Evidence Of Secondary Considerations Did Not Warrant A Finding Of Non-Obviousness

NuVasive devotes much of its argument on appeal to disputing the Board's

weighing of its evidence of secondary considerations of nonobviousness.  Although NuVasive repeatedly accuses the Board of "disregarding" or "turning a blind eye" to that evidence, the Board considered *all* of NuVasive's evidence thoroughly, at length, A25-39, and in a manner consistent with this Court's precedents.  Only after "consideration of *all* the evidence, including the evidence in the Petition *and Patent Owner's objective indicia of non-obviousness*" did the Board make its ultimate determination of obviousness.  A39.

The Board's analysis is supported by substantial evidence.  The Board found: (i) that NuVasive did not establish a sufficient nexus between its secondary consideration evidence and the claimed invention (A26-29) (ii) that the secondary consideration evidence was weak and entitled to little weight, for reasons the Board explained in detail for each piece of evidence (A29-39), and (iii) that the inconsistent positions that NuVasive took across its multiple IPRs—claiming the *same* evidence established non-obviousness of different claims and different inventions—further undermined NuVasive's arguments and the strength of its evidence (A35-36).  The Board's findings are supported by substantial evidence and NuVasive fails to show otherwise.

### A.    Substantial Evidence Supports The Board's Finding That There Was An Inadequate Link Between The Alleged Success And Praise Of XLIF And The Claimed Invention

In any obviousness analysis, "[s]uch secondary considerations as commercial

success, long felt but unresolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham*, 383 U.S. at 17-18; *see also KSR*, 550 U.S. at 415. To ensure that "secondary considerations" evidence is actually "utilized to give light to the circumstances surrounding the origin of *the subject matter sought to be patented,*" *Graham*, 383 U.S. at 17-18, this Court (and its predecessor) have long held that "[a] nexus is required between *the merits of the claimed invention* and the evidence offered, if that evidence is to be given substantial weight." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983).[3] The weight to be given to secondary considerations depends upon the strength of the nexus between the evidence and the allegedly novel aspects of the claims: "To the extent that the patentee demonstrates the required nexus, his objective evidence of nonobviousness will be accorded more or less weight." *In re GPAC*, 57 F.3d at 1580.

By any measure, NuVasive's secondary considerations evidence was entitled to little weight under that standard. There is no nexus where the secondary

---

[3] *See also, e.g.*, *S. Ala. Med. Sci. Found. v. Gnosis S.P.A.*, 808 F.3d 823, 826-27 (Fed. Cir. 2015); *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1245-46 (Fed. Cir. 2010); *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995); *Solder Removal Co. v. U.S. Int'l Trade Comm'n*, 582 F.2d 628, 637 (C.C.P.A. 1978). *In re Thompson*, 545 F.2d at 1295 & n.2; *In re Caveney*, 386 F.2d 917, 923 (C.C.P.A. 1967) ("[C]ommercial success may be looked to *in those circumstances in which it may fairly be an indication of the obviousness or nonobviousness* of the invention. ….. Utilization of any of these aids, …  must inevitably await the initial establishment of a nexus between the subtest and nonobviousness.").

considerations "result[ ] from something other than what is *both claimed and novel* in the claim," *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (emphasis altered), are "due to an unclaimed feature," *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006), are due to a feature "known in the prior art," *id.*, or are otherwise not "commensurate in scope with the claims," *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008) (quoting *Ormco*, 463 F.3d at 1312). "Commercial success due only to superior business acumen, or effective advertising, is of no relevance." *Solder Removal*, 582 F.2d at 637; *see also Thompson*, 545 F.2d at 1295 (similar). Likewise, "[n]ot every competing product that arguably falls within the scope of a patent is evidence of copying; otherwise, every infringement suit would automatically confirm the nonobviousness of the patent." *Wyers*, 616 F.3d at 1246 (reversing jury verdict of nonobviousness) (internal quotation marks omitted).

The Board was thus appropriately skeptical of NuVasive's assertions, for example, that its entire company's revenues were powerful evidence of the nonobviousness of claims 1, 5, 7-9, 13-18, and 20 of the '782 patent, or that evidence that others competed with NuVasive's "XLIF" products and techniques constituted "copying" of the '782 patent claims. It is not the law that every profitable company that practices its patents is entitled to prevail against a validity challenge. NuVasive's quarrels with the Board's weighing of the evidence demonstrate no error.

46

1.    **"XLIF" Comprises Various Systems Of Surgical Tools, As Well As A Surgical Technique, None Of Which Is Commensurate With The '782 Claims**

As described above, *Statement of the Case § II.B.2.a*, most of NuVasive's secondary considerations evidence centered on "XLIF," a broad term NuVasive has used to mean different things at different times, and now uses to refer to a lateral-approach spinal surgical procedure, a range of products, and techniques associated with that procedure. *See, e.g.*, A27 (citing Ex. 2020 ¶ 22, Att. B, p. 129); A6250-77.

"XLIF" is in no way congruent with the patent claims at issue in this case. NuVasive's regulatory filings refer to an "XLIF patent portfolio" containing dozens of patents of varying scope, and its patent owner response referred to the '782 patent as "*one of many* owned by Patent Owner NuVasive that protects its pioneering eXtreme Lateral Interbody Fusion ("XLIF") systems and method." A412. To establish a nexus between "XLIF" and the claims in this case, however, NuVasive had to do more than simply assert that the '782 patent was "one of many" claims that "XLIF" practices; it had to show that any "commercial success" was due to "what is *both claimed and novel* in the claim," *In re Huai-Hung Kao*, 639 F.3d at 1068. In other words, it had to show *why* any "commercial success" of "XLIF" had anything to do with particular features of the claims before the Board.

The Board was entitled to find that NuVasive failed to make that showing. The marketing brochure (A6250-A6277) that NuVasive's expert calls the "NuVasive

47

XLIF surgical technique," A5808(¶22), for example, illustrates the mismatch between "XLIF" and the claims at issue here.

*First*, even if one were to assume that XLIF was a system of instruments, NuVasive's XLIF marketing brochure contains numerous such "systems," each having their own set of surgical instruments and other equipment. A6253-A6259, A6273-6276. For example, the brochure refers to the "XLIF Instrument System," a "General Instrument System," a "MaXcess II Access System," and a "Neurovision System." A6253-A6259. Notably, the "XLIF Instrument System" comprises a set of 14 different instruments, and does *not even include* dilating cannulas or nerve monitoring technology. A6253. Rather, it includes a wide variety of *unclaimed* surgical instruments, including a t-handle, nerve retractor, bipolar forceps, an implant tamp, a suction nerve retractor, a cobb elevator, to name just a few. *Id.* Dilating cannulas are included among several other instruments in a different "system," the MaXcess II access system. A6257-58. Nerve-monitoring equipment is included in yet another system, the "Neurovision System," A6259. Despite that, NuVasive attempted to establish success and praise of "XLIF" generally, without tying that evidence to the claims in this case.

*Second*, to the extent NuVasive was relying on the XLIF surgical *procedure* to establish secondary considerations—which it was, *see* A5808-10(¶¶22-23), that reliance was misplaced. All of the '782 patent claims are system claims. Alleged

48

success and praise for unclaimed methods and techniques of using such instruments are not evidence of non-obviousness of the '782 claims. *Ormco*, 463 F.3d at 1312. And in any event, the "XLIF surgical technique" is not based solely (or even primarily) on dilating cannulas equipped with stimulation electrodes, as recited in the '782 claims. Rather, it makes use of *all* the various "systems" of instruments described above, most of which are unclaimed. A6260 (listing "equipment requirements"). Moreover, the XLIF technique is much more than the step of creating a working corridor to the spine, which is the focus of the '782 claims. Of the nine separate steps of the XLF surgical technique, only one is directed to the creation of a working corridor in a "transpsoas approach." A6261-6272.

Accordingly, any evidence of praise or commercial success of "XLIF" generally provides no indication of whether any such success is due to the dilating cannulas with stimulating electrodes, to the many other unclaimed surgical instruments and surgical techniques captured under the "XLIF" umbrella, or even to some other reason or reasons altogether. Yet all of the evidence that NuVasive offered referred generically to "XLIF" or the "XLIF surgical technique," and none of it attributed the success or praise of "XLIF" specifically to dilating cannulas with stimulation electrodes. *See, e.g.*, A5810(¶23) (referring to "the introduction of the XLIF technique"); A5814(¶28) (referring to the "XLIF procedure and systems"); A5818(¶38) (referring to "the general introduction of XLIF by NuVasive").

49

NuVasive's appeal brief repeats the error of referring to XLIF at a high level of generality, failing to even attempt to tie any of its evidence specifically to the claimed dilators with stimulation electrodes. *See, e.g.*, NuVasive Opening Br. at 4-5 ("NuVasive pioneered the surgical *procedure* that made the lateral, trans-psoas approach safe. NuVasive calls this innovation 'eXtreme Lateral Interbody Fusion,' or 'XLIF.'").

NuVasive argues that the Board erred in disregarding its evidence of nexus on procedural grounds. NuVasive Opening Br. at 53. The Board's rules prohibit using incorporation by reference to circumvent page and word limits, and the Board was well within its discretion to enforce its rules. 37 C.F.R. § 42.6(a)(3). Nevertheless, the Board *did not* ultimately "disregard" that evidence. It examined all of NuVasive's evidence, including its expert Dr. Phillips' declaration and his claim charts, and found that "it is unclear what product(s) Dr. Phillips is mapping to the claims," because— much like the rest of NuVasive's secondary considerations evidence—Dr. Phillips failed to distinguish the relevant features of XLIF from the many other unclaimed instruments, equipment, and surgical techniques that are used in an XLIF procedure. A27-A28.

The evidence below thus supports the Board's finding that NuVasive "does not establish adequately what XLIF is," "whether it is encompassed by the claims of the '782 patent," or "how [NuVasive] is mapping the features of XLIF to the claims."

A26-27. Rather, as the Board observed, NuVasive's description of its XLIF system and/or technique at a "high degree of generality" was insufficient, particularly in view of the fact that the XLIF procedure contains much more than the elements recited in the '782 claims. A26-29.

## 2. The Features Of XLIF That NuVasive Contends Are Responsible For The Alleged Praise And Success Are Not Recited In The Claims

Not only did NuVasive fail to prove that the alleged success of XLIF is due to features found in the '782 claims, but the record evidence instead showed that any success and praise was in fact due to the many *unclaimed* features of XLIF. Before the Board, and again on appeal, the "necessary" and "critical" features that NuVasive identified as responsible for the success of the XLIF procedure are not recited in the claims. *E.g.*, A430, A439-440; NuVasive Opening Br. at 22-55.

Specifically, NuVasive and its declarants attributed the alleged success and praise of XLIF to unclaimed features such as:

(i)    the 3-bladed MaXcess retractor system (A427; A436; A4274-76(103:9-105:22); A4355(184:12-22); A6013-15(¶27)),

(ii)   marketing to and training of surgeons (A434; A5996-97(¶14); A7513-17),

(iii)  NuVasive's NeuroVision monitoring system (A428-30 (crediting NeuroVision for "much, if not all," of the adoption); A439),

(iv)   nerve monitoring that is "real time," "discrete," "surgeon-directed," and "automated" (A424; A428-30; A4258-60(87:17-89:21); A3322),

(v)    size of the surgical incision (A433; A435; A440),

(vi)   "strict adherence to surgical technique including neuromonitoring," (A434; A4095-4101(144:22-150:4); A4340-49(169:14-178:11)),

(vii)   NuVasive's load bearing implant (A429; A2839-43(¶¶7-10); A2886; A3305(claim 1); A3448; A4048-49(97:12-98:18); A6836),

(viii)   the safety and reproducibility of the procedure (which it attributes to implant design and the extreme approach) (A428-29; A6012-13(¶25); A2839-43(¶¶7-10); A2886; A3448),

(ix)   insurance reimbursement (A6793; A6836),

(x)   'strict[]' adherence to operating room procedures such as proper patient positioning, use of a hinged operating table, and use of multiple K-wires, fluoroscopy, multiple incisions, a 3-bladed retractor, shims, etc. (A4095-101(144:22-150:4); A6261-72).

Moreover, although the '782 claims generally recite a "stimulation electrode … positioned on at least one of the dilating cannulas," NuVasive attributes much of XLIF's success to sophisticated, unclaimed nerve monitoring techniques and systems, including: automation, real-time sensing, dynamic threshold monitoring, electrification of each instrument, and a proprietary hunting algorithm.[4] A424; A428-30; A439; A5813(¶26); A2998-99(469:18-470:24); A3078(191:12-193:14); A4246-48(75:20-77:6); A6013-15(¶27). It is these unclaimed monitoring features that NuVasive told the Board "ensure" the safety of the XLIF procedure, and are "important," "integral," "fundamental," "necessary," "enabling," and the "linchpin" to

---

[4] NuVasive did not provide a nexus analysis for any of the '782 patent's dependent claims. (A5919-27.) Regardless, none of the dependent claims recite specific nerve monitoring system control features like automated, real-time, dynamic, discrete-threshold, or an algorithm.

XLIF's success. *Id.*

NuVasive also attributes XLIF's success to it being an "extreme" approach, that is, one that is *directly* lateral—even as compared to other psoas approaches, including the postero-lateral approach. *E.g.* A5809-11(¶ 23); A424; A439; A2937-40(405:21-408:1); A4216(45:9-17); A4452-56(45:3-49:14); A4503(96:11-21); A6030-34(¶¶ 16-19); *see also* NuVasive Opening Br. at 18. Yet as the Board found, the claims do not require such an approach. A29. Thus "the key non-obvious inventive concept" that NuVasive identified is not a requirement of the claims and therefore cannot serve to create a nexus between the XLIF procedure and the *claimed* invention. *Id.*; *In re Huai-Hung Kao*, 639 F.3d at 1068; *Ormco*, 463 F.3d at 1312.

NuVasive argues that the Board erred because NuVasive need not prove the success of all potential embodiments that may be covered by its claims. NuVasive Opening Br. at 55. NuVasive's assertion misses the mark. The Board did not fault NuVasive for failing to prove *every* approach through the psoas muscle successful. A29. Rather, it correctly pointed out that the very feature on which NuVasive relied so heavily—an extreme approach through the psoas—is not recited in the '782 claims. *Id.* Along those lines, the Board correctly found NuVasive's evidence as a whole failed to tie the success of XLIF to the allegedly *novel* features recited in the claims. A26-A29.

53

## B.    Substantial Evidence Supports The Board's Weighing of NuVasive's Secondary Considerations Evidence

The Board's weighing of NuVasive's secondary considerations evidence was supported by substantial evidence and consistent with this Court's precedents. The Board appropriately held Medtronic to its burden of proof and considered NuVasive's secondary considerations evidence "before reaching an obviousness determination." *Cyclobenzaprine*, 676 F.3d at 1079; A25. The Board thoroughly considered each piece of evidence to the extent it was probative of nonobviousness of claims 1, 5, 7-9, 13-18, and 20 of the '782 patent, A25-39, and found that NuVasive's evidence was, on the whole, entitled to little weight.

On appeal, NuVasive tries to exploit the Board's thoroughness. Each time the Board explained why it found particular evidence unpersuasive, NuVasive accuses the Board of fabricating a new legal requirement. *Compare, e.g.*, A32-33 (Board noting that much of NuVasive's evidence of skepticism followed by praise "consists of personal recollections of Dr. Phillips," that "the objectivity of this evidence is questionable, as both [witnesses] are paid consultants to Patent Owner and are testifying long after the fact," and concluding that "[e]ven if fully credited, however, Patent Owner's evidence is not persuasive to show a nexus…"), *with* NuVasive Opening Br. at 60-61 (accusing the Board of "disregard[ing] testimonial evidence because a witness is compensated for their time and expense testifying"). At bottom, NuVasive's true dispute is with the Board's weighing of the evidence, but NuVasive

54

fails to show error in that analysis.

*First*, the Board appropriately concluded that, even if there was a nexus between "XLIF" and claims 1, 5, 7-9, 13-18, and 20 of the '782 patent, NuVasive's evidence of alleged commercial success reached far beyond just XLIF, and included implants and other services.  Specifically, NuVasive offered its *overall corporate revenues*, citing to the growth of NuVasive as a company between 2004 and 2013. A6012(¶25); A436-438.  But the evidence shows that the overall corporate revenues include sales of *unclaimed* implants and other items and services that are not part of the XLIF system.  *See, e.g.*, A6846; A6771-72; A34.

Moreover, the evidence shows that NuVasive typically loaned the claimed surgical instruments—including the cannulas equipped with nerve monitoring technology—to surgeons "at no cost":

> *Revenues.*  To date, the majority of our revenues have been derived from the sale of implants, biologics and disposables, and we expect this trend to continue for the foreseeable future. *We generally loan our proprietary software-driven nerve monitoring systems and surgical instrument sets at no cost to surgeons and hospitals that purchase disposables and implants for use in individual procedures.* In addition, we place our proprietary software-driven nerve monitoring systems, MaXcess® and other MAS or cervical surgical instrument sets with hospitals for an extended period at no up-front cost to them."

A6836; A36-37 (quoting same); A4048-49(97:12-98:3).  NuVasive argues that there is no reason that sales of one item, such as the implants sold for use in typical spinal procedures, cannot serve as a proxy for sales of another.  NuVasive Opening Br. at 63.

55

The Board was entitled to find that inference less than compelling on the facts of this case.  A37.  Substantial evidence supports the Board's finding that "products other than XLIF were the primary drivers of Patent Owner's commercial success."  A37.

*Second*, NuVasive's evidence relied on an incorrect definition of the relevant market.  It is well established that, without sufficient "economic evidence" defining the relevant market, evidence of commercial success may be entitled to little or no weight.  *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1026-27 (Fed. Cir. 1985), *overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999).  Knowledge of the market is necessary to discern whether sales represent "anything out of the ordinary in the industry involved." *Id.* at 1027.  Here, NuVasive's evidence focused on the market for lateral spinal fusion procedures, but it ignored the *overall* spinal fusion market.  A7510.  As Medtronic's evidence established, it is the overall fusion market that is the true market, because XLIF competes with other minimally-invasive approaches to the spine, as well as open spinal surgeries.  A2813-20(¶¶ 10-28).  When the competition is properly considered, it turns out that NuVasive's XLIF procedure accounts for a mere 5% of the market. *Id.*; A439.  In fact, NuVasive itself offers surgical approaches other than XLIF.  (A2815-20(¶¶17-28); A4240-41(69:7-70:1).  Thus, when viewed under the proper lens, the commercial "success" of XLIF is entitled to much less weight than NuVasive contends, as the Board properly found.

*Third*, NuVasive's attempt to show praise following initial skepticism fell short. Like other secondary considerations evidence, "[i]ndustry praise must also be linked to the patented invention." *Geo. M. Martin, Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1305 (Fed. Cir. 2010). Self-serving statements are generally entitled to little weight. *Id.* If it were otherwise, every company with marketing staff could conjure evidence of "industry praise," much as NuVasive attempted to do here. The majority of NuVasive's evidence of "praise" was either from NuVasive or people NuVasive paid, or generic statements unconnected to any allegedly novel features of the claims in this case. A439; A3895-904(18:19-27:7); A3907-908(30:24-31:19); A3909-14(32:15-37:7); A4058-63(107:11-112:18); A4117-26(166:17-175:21); A4131(180:9-22); A4185-87(14:18-16:10); A4365(194:1-9). The Board properly questioned the objectivity of that evidence, and found that it had little bearing on non-obviousness. A33. NuVasive accuses the Board of fabricating a nonexistent legal requirement and misapprehending the meaning of references in precedent to "secondary considerations" as "objective indicia of nonobviousness." NuVasive Opening Br. at 60-61. The Board did no such thing. A32-33. To say that self-interested and anecdotal evidence of "praise" is not as strong as more objective and rigorous evidence is not to say that the latter is *per se* required. The Board was merely explaining its weighing of evidence as a conscientious fact finder. And in any event, the Board did not "disregard" NuVasive's evidence; it simply gave it appropriately

little weight. *See* A33 ("[e]ven if fully credited, however, Patent Owner's evidence is not persuasive to show a nexus…").

*Fourth*, NuVasive's reliance on various anecdotal patient testimonials of improved outcomes is misplaced. NuVasive merely cited broad, generic statements, drawn to no specific features (much less patented features), and primarily touting the recovery-time benefits of minimally-invasive surgery generally over traditional open surgery. A434-A436. For example:

- "I was amazed. I was in one day and out the next[.]" A434-35 (quoting A6560).

- "But, remarkably, within twenty-four hours I was up and walking. Within just a few days, I was released from the hospital and able to climb stairs." A435-36 (quoting A6599).

The second "testimonial" quoted above came from a "paid spokesperson" of NuVasive. A6583, A6586-87. The Board was entitled to give such evidence little or no weight. In any event, none of the proffered "testimonials" attributed their success to any of the claimed features, either alone or in combination.

*Fifth*, NuVasive's "copying" evidence is likewise suspect. It consisted almost entirely of financial industry reports, which state that competitors now offer "a lateral access and/or neuromonitoring system." A442; A3904-6(27:9-29:2); A3918-25(41:20-48:8); A3929-30(52:2-53:16). That proves nothing, particularly considering that both lateral access (*e.g.*, Obenchain, A262; A4229(58:4-11)) and nerve monitoring systems (*e.g.*, Marino, Kelleher) were both well known in the art at the time of the '782 patent.

This Court repeatedly has made clear that secondary considerations evidence of "copying" generally refers to "the replication of a specific product," "demonstrated either through internal documents," or through direct evidence such as "disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a virtually identical replica," or through "access to, and substantial similarity to, the patented product." *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004); *Wyers*, 616 F.3d at 1246. Were it otherwise, "every infringement suit would automatically confirm the nonobviousness of the patent." *Wyers*, 616 F.3d at 1246 (quoting *Iron Grip*, 392 F.3d at 1317). Other than a generic Medtronic document acknowledging NuVasive's XLIF, NuVasive admitted no evidence proving Medtronic's competing procedure is covered by the '782 claims, or that Medtronic ever made any attempt to replicate XLIF. A2820(¶27); A2815-20(¶¶17-27). On this record, the Board was entitled to find that NuVasive's "copying" evidence was nothing more than pedestrian business competition, and was not generally probative of nonobviousness of the claims at issue in this case. A38-39.

*Finally*, as the Board found, NuVasive's assertion that the '782 patent filled a long-felt need is inconsistent with the evidence. A29-32. Like other secondary considerations, evidence of "long-felt need" is only probative to the extent that it is tied to the merits of the claims in the case. "[M]ere passage of time without the claimed invention is not evidence of nonobviousness." *Iron Grip*, 392 F.3d at 1325

59

(citing *In re Wright*, 569 F.2d 1124, 1127 (C.C.P.A. 1977). In this case, there was not even any significant passage of time. NuVasive and its declarant Dr. Phillips admit that, at the time of the '782 patent, surgeons knew how to approach the spine in numerous ways, including through the psoas muscle. A422-43; A5826-27. And with each of the known approaches, there were benefits and drawbacks. A421. NuVasive argues that there thus existed a long-felt need to "safely and reproducibly create a lateral transpsoas approach to the lumbar spine." A422. History has proven NuVasive wrong. Over a decade after the introduction of XLIF, use of that approach continues to be eclipsed by use of other approaches and even by open surgery. A4243(72:16-24); A6775. And the claims here are not limited to "a lateral transpsoas approach."

In sum, the Board was correct to afford NuVasive's secondary considerations evidence little weight. The Board's determination of obviousness is amply supported by the evidence.

### C. NuVasive's Inconsistent Positions Below Further Undermined its Secondary Considerations Evidence

NuVasive's global litigation strategy below actually highlighted its inability to tie the success of its XLIF procedure to any one patent or claim, let alone any one allegedly novel feature of any one patent. Before the Board, NuVasive attempted to claim *all* the success and praise of XLIF for *each* and *every* challenged NuVasive patent. It continues to do so on appeal. Never has NuVasive attempted to apportion

60

that success between the various claims of the various patents. NuVasive's overreaching is its undoing. It shows that the success of XLIF is *not* tied to any of the claimed inventions across any of the various patents it asserts. At best, it shows that the proportion of success due to the '782 patent claims may be a mere undefined fraction of the entire success. But even that small fraction, if it exists at all, is unknown because NuVasive did not offer any nexus evidence.

The Board recognized that "[NuVasive] has not been consistent in its attribution of commercial success." A35. The Board found that it was inconsistent for NuVasive to attribute the entire success of XLIF in this case to a combination involving cannulated dilators, while in a separate proceeding attributing that same success to a combination involving retractors, and it yet another proceeding to the spinal implants. A35-36. The Board was more than entitled to weigh NuVasive's inconsistent position in this and other proceedings against it when weighing the probative value of NuVasive's secondary considerations evidence.

## CONCLUSION

The Board's final written decision should be affirmed.

April 27, 2016                                    Respectfully submitted,

                                                  */s/* John C. O'Quinn
                                                  _____

Justin J. Oliver                                  John C. O'Quinn
FITZPATRICK, CELLA,                               William H. Burgess
   HARPER & SCINTO                  Dennis J. Abdelnour
975 F Street, N.W.                                Brian H. Gold*
Washington, D.C. 20004                            KIRKLAND & ELLIS LLP
(202) 721-5423                                    655 Fifteenth Street, N.W.
                                                  Washington, D.C. 20005
                                                  (202) 879-5000


Jeff E. Schwartz                                  Sharre Lotfollahi
FOX ROTHSCHILD, LLP                               Kevin Bendix
1030 Fifteenth Street, N.W.                       KIRKLAND & ELLIS LLP
Washington, D.C. 20005                            333 South Hope St.
(202) 696-1470                                    Los Angeles, CA 90071
                                                  (213) 680-8400

*Counsel for Medtronic, Inc.*

---

* Admitted only in Virginia, practice is supervised by principals of the Firm.

## <u>CERTIFICATE OF COMPLIANCE WITH<br>TYPE-VOLUME LIMITATION</u>

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7).  According to the word-processing system used to prepare this document, the brief contains 13,496 words.

*/s/* John C. O'Quinn
_____

## <u>CERTIFICATE OF SERVICE</u>

On April 27, 2016, this brief was submitted to the Court through the CM/ECF system.  All parties are represented by registered CM/ECF users and will be served electronically by the CM/ECF system.

*/s/* John C. O'Quinn
_____
